[Civ. No. 36278. Second Dist., Div. Five. Aug. 3, 1970.]

DELORES BARAJAS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Daye Shinn for Petitioners.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Daniel L. Lieberman, Deputy District Attorneys, for Real Party in Interest.

## OPINION

KAUS, P. J.—After a preliminary hearing the district attorney, on February 27, 1970, filed an information in the respondent court charging the petitioners Mercado and Barajas jointly with possession of Benzedrine and Seconal for sale (Health & Saf. Code, § 11911—count II) and possession of marijuana (Health & Saf. Code, § 11530—count III). Mercado and one Bohl, who is not involved in this proceeding, were charged with selling, furnishing and giving away Seconal (Health & Saf. Code, § 11912—count I), Barajas alone was charged with possession of Benzedrine (Health & Saf. Code, § 11910—count IV). A motion to set aside the information, made pursuant to section 995 of the Penal Code was denied and petitioners then applied to this court for a writ of prohibition. (Pen. Code, § 999a.) We issued an alternative writ.

### FACTS

At 8:35 p.m. on January 29, 1970, State Narcotic Agent Fleischer who was in the company of an informer, had a conversation with Bohl outside Big John's Pizza Parlor in Long Beach. After the conversation Bohl left in his car and drove to a single family residence at 245 LaVerne, followed and observed by Officer Gath of the Long Beach police. He entered and five minutes later emerged with Mercado who was carrying a blue suitcase which he put in the trunk of Bohl's car. They drove to Hamburger Henry's where they met Agent Fleischer in the parking lot. Bohl asked to see Fleischer's money. Fleischer wanted to see the "keg" first. Bohl opened the trunk of his car and pointed to a blue suitcase. Mercado invited Fleischer to open it. Fleischer did so and observed 10 plastic bags containing about 5,000 capsules each. It was later stipulated that a forensic chemist would have testified that they contained Seconal (count I). Fleischer started a discussion of the price of the "keg" with Mercado who suggested that they enter an automobile because it was not "cool" out there. Fleischer then put the suitcase inside the trunk of his car. This was a prearranged signal to several other officers who were apparently observing the transaction from a distance. Mercado and Bohl were arrested and promptly advised of their constitutional rights, which they waived. Mercado then stated that he lived at 245 LaVerne, had left his home knowing he was going to sell "to the man," had been "dealing" for a long time and had a keg of "whites" (Benzedrine) in the bedrocm closet of his house. He also said that only his wife and baby were at the house at the time. He refused, however, to permit the officers to return to and search the house, unless they had a search warrant. He was told that one would be obtained.

Mercado was taken to a police station, while Fleischer in the company

of five officers went to 245 LaVerne. Herewith his description of his initial encounter with petitioner Barajas: ". . . I knocked on the door, a female voice stated, 'Al and Allen?' At that time I stated, 'State Narcotic Agents. We would like to talk to you.' Subject Barajas opened the door at that time. I showed her my ID card and read her, 'Department of Justice, State Narcotics Agent.' I asked if we could come in and talk to her, and she stated, 'No, I don't know what you are talking about.' I stated to her that subject Mercado had told us that he lived at this residence with his wife and baby, and that there was a keg of whites in the bedroom closet, and also that there was numerous registered guns in the residence and that we would like to come in and talk to her. And she stated, 'No. I don't know what you are talking about.' I asked her if we could come in and search, and she stated, 'No, you don't have a search warrant.' I explained to her that we felt that there was a felony being committed in our presence and that we would have to come in to secure the residence until we could obtain a search warrant. At that time she started to close the door and started screaming and kicking, and we forced entry. . . ." After two minutes Fleischer left and obtained a search warrant from Judge Sutherland of the Long Beach Municipal Court, with which he returned about two and one-half hours later.

On cross-examination, in answer to the question: "Did you at any time ask defendant Barajas whether or not she lived there?" he replied: "She stated that we must have the wrong house that she only lived there with her little baby, that nobody else lived in the residence." At no time during the preliminary hearing was it developed whether that question was asked before or after the officers' entry. For that matter, none of the several officers who testified was ever asked specifically whether the purpose of the entry was to arrest Barajas or merely to prevent her from disposing of any drugs until a search warrant could be obtained and executed.[1] The most we know from the record is that the reason why she was handcuffed was that she was assaulting the officers.

Before Fleischer's return with the warrant other officers went through the house to look for other persons. They found a child described both as a "little boy" and a "little baby." No search for drugs or other contraband was made until Fleischer returned with the search warrant. They then found about 1,000 Seconal capsules (count II) and a certain amount of Benzedrine in a hall closet, marijuana on a table in the den (count III), some

---

[1] The record contains ambiguous testimony from Officer Castillo which can be interpreted to mean that he took Barajas into custody after the warrant had been obtained and, possibly, at least partially executed. This does not, however, negative an earlier arrest.

more Benzedrine in Barajas' purse (count IV) and 50,000 Benzedrine tablets in the laundry hamper in the bedroom closet (count II).

## MERCADO'S PETITION

■ Mercado's petition is clearly frivolous. He argues only an alleged lack of evidence of knowing possession. He does not even distinguish between the 50,000 Seconal tablets found in the blue suitcase and other items found in the house. The proof of his actual knowing possession of the former and constructive knowing possession of the latter was so obviously adequate that no further discussion is required. (*People* v. *Redrick*, 55 Cal.2d 282 [10 Cal.Rptr. 823, 359 P.2d 255].)

## BARAJAS' PETITION

Barajas does not attack the validity of the warrant obtained by Fleischer. She claims, however, that the success in its execution was nevertheless the fruit of a poisonous tree—the officers' forced entry and continued presence while the warrant was being obtained.

When we granted the alternative writ we thought that we were squarely presented with a problem involving Fourth Amendment law which to the best of our knowledge had never been decided: whether police, who have probable cause to believe that a residence contains contraband, but have neither a search warrant, nor probable cause to arrest anyone in the home, may force entry for the sole purpose of preventing the disposal of the contraband while other officers obtain a warrant.

While in the future course of this litigation some court may yet have to deal with that issue, we have come to the conclusion that the present proceeding does not properly raise it. ■ We feel bound to hold that on the evidence presented to him at the preliminary hearing, the magistrate was entitled to find that the officers had probable cause to arrest Barajas for possession of Benzedrine. (Health & Saf. Code, § 11910.) This fact, of course, would not have authorized a search of the inner reaches of her home (*Chimel* v. *California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]); however the legal arrest of Barajas certainly permitted the officers to prevent her from gaining access to the contraband to frustrate the impending execution of a warrant. To be sure, once Barajas was arrested she should have been booked at a station and not kept prisoner in her own home. However, that illegality did not aid in the discovery of the drugs. Had Barajas been removed from the premises, she certainly would have

had even less opportunity to dispose of them.[2] It remains then to determine whether Barajas' arrest was, indeed, legal.

The police had legally arrested Mercado. He talked freely after an adequate waiver of his constitutional rights. He had absolutely nothing to gain by disclosing the presence of 50,000 Benzedrine pills in his home. (Cf. *People* v. *Spriggs,* 60 Cal.2d 868, 874-875 [36 Cal.Rptr. 841, 389 P.2d 377].) That the statement was not made to curry favor with the arresting officers is demonstrated by Mercado's refusal to permit a warrantless search.[3] Obviously the information he gave was far more "reliable" than information obtained from the usual untested or unreliable stool pigeon. Apparently it was adequate to convince Judge Sutherland to issue the search warrant. This appears to be tacitly admitted by petitioners' failure to attack the warrant. The principle which lifts victims and "citizen" witnesses out of the class of unreliable informers (*People* v. *Hogan,* 71 Cal. 2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Gardner,* 252 Cal.App.2d 320, 324-325 [60 Cal.Rptr. 321]) seems adequate to lend credibility to Mercado's voluntary confession. (See also *Skelton* v. *Superior Court,* 1 Cal.3d 144, 154, fn. 7 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *McFadden,* 4 Cal.App.3d 672, 688 [84 Cal.Rptr. 675].)

Since, however, the validity of the search warrant is not before us we need not hold just what the police were entitled to do based only on the information obtained from Mercado. When they entered the house they knew considerably more about Barajas than they had known when they approached it. We must, of course, disregard her insistence that a search warrant be obtained before proceeding inside. (*Tompkins* v. *Superior Court,* 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Cedeno,* 218 Cal.App.2d 213, 227-229 [32 Cal.Rptr. 246].) There is, however, the extremely suspicious denial that anyone but she and her

[2]It is noted, for whatever legal significance it may have, that Barajas' argument that the discovery of the drugs during the execution of the search warrant was the fruit of illegal police conduct depends entirely on the proposition that the court should have inferred that, had she not been restrained, she would have successfully frustrated the search by removing, hiding or destroying the contraband.

[3]In this respect the present case differs markedly from *Pollock* v. *Superior Court,* 272 Cal.App.2d 548 [77 Cal.Rptr. 565], decided by this division. There we held that the petitioner was illegally arrested when the police had nothing to go on but the statements of two confessed juvenile thieves that they had sold certain stolen goods to petitioner after telling him that the "stuff [was] hot." We pointed to the selfish motives which may have prompted the juveniles' accusation and held that the self-incriminatory nature of their statements did not furnish sufficient corroboration. In the case at bar no conceivable selfish motive for the confession to a wholly independent crime appears in the record. It cannot be seriously suggested that Mercado tried to make things easier for himself by pointing the finger of suspicion at whoever shared his home.

baby lived in the house.[4] Putting this together with what the officers knew about and had heard from Mercado, it seems entirely reasonable for "a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion" (*People v. Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]) that Barajas was then in possession of illegal drugs.[5]

Of course the record is not clear whether the denial of Mercado's residence at the house came before or after the entry. The question was whether Fleischer had "at any time" asked Barajas whether she lived there. However, if the record permits conflicting inferences, it is neither for us, nor for the superior court, to tell the magistrate which he should have drawn. (*Perry v. Superior Court,* 57 Cal.2d 276, 283-284 [19 Cal.Rptr. 1, 368 P.2d 529]; *People v. Heard,* 266 Cal.App.2d 747, 749-750 [72 Cal.Rptr. 374].) Part of Fleischer's answer to the question was that Barajas had said that the officers "must have the wrong house." It seems more likely that this particular phrase would have been used during the introductory phase of the encounter, than after the officers had entered and subdued Barajas.

Finally, as we have already noted, the record is none too clear that the officers intended to arrest Barajas when they entered. Certainly there is no evidence that she was ever advised of the "cause of the arrest." (Pen. Code, § 841; but see *People v. Maddox,* 46 Cal.2d 301, 305 [294 P.2d 6].) Again, however, we cannot say that the magistrate's finding, implied in his refusal to suppress the evidence uncovered in the house, that there was an arrest, is without evidentiary support.[6] We therefore need not consider

---

[4]Among the cases referring to the rule that information from an untested informer plus furtive or suspicious conduct may constitute probable cause—or so holding—are *People v. Talley,* 65 Cal.2d 830, 836-837 [56 Cal.Rptr. 492, 423 P.2d 564]; *Willson v. Superior Court,* 46 Cal.2d 291, 295 [294 P.2d 36]; *People v. Melchor,* 237 Cal.App. 2d 685, 693 [47 Cal.Rptr. 235]; *People v. Currier,* 232 Cal.App.2d 103, 107 [42 Cal.Rptr. 562]; *People v. Cedeno,* 218 Cal.App.2d 213, 224-225 [32 Cal.Rptr. 246].

[5]Thus, even if Mercado comes within the category of an unreliable informer, Barajas' obvious reluctance to be suspected of being associated with him satisfied the requirement of *People v. Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174] and *People v. Reeves,* 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393] that the corroboration go to the essential fact, that the suspect was then violating the law.

[6]The magistrate expressly stated that he doubted that "it was necessary to get a search warrant in the beginning," that the *entry* would have been a proper one without a warrant and that "there was an abundance of evidence to support the premise that there were drugs in the house."

These remarks are somewhat confusing. Not only would the entry have been proper without a warrant—it most assuredly was made without a warrant. Further, one is entitled to suspect from these remarks that the magistrate perhaps thought that the search, as distinguished from the entry, would have been proper even in the absence of a warrant. This is obviously not true—except possibly with respect to the Benzedrine found in Barajas' purse—whether there was no right to arrest her (*Chapman v. United States,* 365 U.S. 610, 613-615 [5 L.Ed.2d 828, 831-833, 81 S.Ct. 776];

the legal consequences which would flow from a factual determination that the officers, though having the right to arrest Barajas on entry, did not exercise it, handcuffed her solely in self-defense and detained her only to prevent the destruction of evidence.

The alternative writ of prohibition is discharged, the peremptory writ is denied.

Aiso, J., and Selber, J.,* concurred.

Petitioners' application for a hearing by the Supreme Court was denied October 22, 1970.

*People* v. *Marshall,* 69 Cal.2d 51, 57 [69 Cal.Rptr. 585, 442 P.2d 665]), or whether there was. (*Chimel* v. *California,* 395 U.S. 752, 766 [23 L.Ed.2d 685, 695, 89 S.Ct. 2034].) However, unless the record makes the assumption preposterous (*People* v. *Russel,* 69 Cal.2d 187, 190-200 [70 Cal.Rptr. 210, 443 P.2d 794]; *People* v. *Robarge,* 41 Cal.2d 628, 633-634 [262 P.2d 14]) we must assume that the magistrate applied correct legal principles to his rulings. (*People* v. *Risenhoover,* 70 Cal.2d 39, 57 [73 Cal.Rptr. 533, 447 P.2d 925]; *People* v. *Gorshen,* 51 Cal.2d 716, 734 [336 P.2d 492].) Clearly the remarks referred to do not demonstrate an erroneous concept of applicable Fourth Amendment law. We therefore assume that the remark about the legality of the entry without a warrant was made with reference to the only purpose of the entry to which it was constitutionally relevant: the arrest of Barajas and nothing but that arrest.

*Assigned by the Chairman of the Judicial Council.