[Civ. No. 40967. Second Dist., Div. Five. Feb. 14, 1973.]

PAUL THOMAS SHUEY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

536

## COUNSEL

Edward L. Lacy for Petitioners.

No appearance for Respondent.

Joseph P. Bush, District Attorney, Harry Wood, Harry B. Sondheim and Daniel L. Bershin, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**KAUS, P. J.**—Petitioners Paul Thomas Shuey ("Paul") and Vickie Shuey ("Vickie") pray for a writ of mandate to order the respondent court to suppress evidence secured in the execution of a search warrant. In that court they are charged, by information, with violations of sections 11530, 11530.5 and 11910 of the Health and Safety Code. On August 22, 1972, the court denied their motion to suppress a certain quantity of marijuana and amphetamines which were secured during a search of their residence on December 27, 1971.

### FACTS

On December 22, 1971, Officer Fisk of the Los Angeles Police Department was told by an unnamed confidential informer that an individual named Paul, who answered a certain description, lived with his wife whose name was unknown to the informer, at 7237 Variel in Canoga Park. Within 96 hours before imparting this information to Fisk, the informer had seen five "lids" of marijuana in Paul's apartment at that address. As far as Fisk was concerned the informer was reliable because Sergeant Holcomb, a federal narcotics officer, had told him so. Holcomb's opinion that the informer was reliable was based on the fact that he had been of assistance in investigating cases against 15 persons suspected of involvement with cocaine. None of these had been arrested, but they were "awaiting" grand jury indictment.

Five days later, on December 27, at 11 a.m., Fisk and two other officers went to the Variel address. Paul answered Fisk's knock.[1] Fisk identified

---

[1] Vickie does not figure at all in the evidence produced at the motion to suppress. The fact that she was bound over leads us to believe that the transcript of the preliminary hearing contains some evidence connecting her to the contraband which was the subject of the motion to suppress.

himself as a police officer, stated that he was conducting a narcotics investigation, revealed that he had information that there was marijuana at the location and expressed his desire to discuss the matter with Paul. Fisk also told Paul that he wanted his consent to search the apartment. Paul would neither converse nor consent. When informed that Fisk would attempt to get a search warrant, he told him to go ahead and get it. Fisk said that he would "secure" the premises while he obtained the warrant.

The officers then entered uninvited through the open door. They encountered no physical resistance. Fisk left shortly and returned with a warrant more than three hours later. The other two officers remained.

Precisely what the ground rules in force during the occupation of Paul's home were, is not too clear. Officer Aliano, one of two who remained, testified that he "had [Paul] sit down in the living room and myself and Officer Mirousky sat there with them [*sic*]." The way Aliano saw it, Paul was under arrest.[2] He was "allowed" to make telephone calls. He reached his attorney who came to the apartment and "requested" to confer with his client. This he was permitted to do, but only where the officer "could still see them." The attorney and Paul then played chess.

No search was conducted while Fisk was away on his errand. Aliano, however, conceived it to be his mission to secure the apartment "from the inside," and to prevent the destruction of any evidence by "actions of the defendant to be warranted."

In practical effect, then, the officers "seized" everything in the apartment, and detained Paul's person, hoping that a search warrant would later permit them to particularize the seizure and to arrest Paul.

Fisk returned with a search warrant at about 2 p.m. After the ensuing search revealed the contraband in question—it was somewhere in the living room and in the kitchen—Paul was arrested. We do not know when or where Vickie was arrested. The record, however, negatives the possibility that she was in the apartment before the contraband was discovered.

## DISCUSSION

Before turning to the issues which are involved in this appeal, we must mention a couple which are not:

1. It is manifestly questionable whether, when they first arrived at the Shuey residence, the officers had enough information to justify the issuance

---

[2]Obviously Paul's detention served any investigative purpose in a wholly negative way. The only investigating the police were doing with him was to keep him away from any contraband in the home.

of a warrant. Their conversation with Paul added nothing. (*Tompkins* v. *Superior Court*, 59 Cal.2d 65, 67-68 [27 Cal.Rptr. 889, 378 P.2d 113].) The fact is, however, that they did obtain a warrant. Its validity was not attacked at the 1538.5 hearing. We therefore assume it to have been valid.

2. We cannot solve this case by holding, as the People now suggest we should, that the police had probable cause to arrest Paul when they first arrived at his apartment. This would enable us to say, as we did in *Barajas* v. *Superior Court*, 10 Cal.App.3d 185, 189-192 [88 Cal.Rptr. 730], that the continued presence of the police in the apartment had nothing to do with the later seizure of the contraband pursuant to the warrant, because Paul cannot make a factual showing that the contraband would not have been there, had the police taken him to the station to be booked.[3]

At the time of the motion to suppress, the People expressly disavowed any claim that there was a right to make an arrest of Paul before the contraband was actually found. The same principle which forbids us to reexamine the validity of the warrant, keeps us from basing our decision on a theory which the People expressly discarded. (*Giordenello* v. *United States*, 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245]; *People* v. *Hamilton*, 71 Cal.2d 176, 182 [77 Cal.Rptr. 785, 454 P.2d 681].)

We therefore cannot avoid attempting to solve the tough questions which this record does present. These are: (1) Whether under the circumstances of this case the police acted illegally in occupying petitioners' apartment and detaining Paul, thereby effectively accomplishing an inchoate seizure of any contraband for which the hoped-for warrant would permit them to search; (2) Whether, as a matter of policy, a defendant should be permitted to urge judicial suppression of evidence, where his motion is necessarily based on the proposition that the illegal police conduct merely prevented destruction[4] of contraband, so as not to frustrate its seizure pursuant to a valid warrant. Viewing the question differently, it is whether petitioners are estopped to rely on the exclusionary rule; (3) Whether under the facts of this case petitioners proved, as an issue of fact, that but for the allegedly illegal police conduct, the destruction would have taken place.

---

[3]The record is somewhat vague with respect to the precise location of the contraband when it was eventually found. It is, however, clear that it was not on Paul's person.

[4]We use the term "destruction" generally, to include concealment in such a fashion that the search would have been fruitless.

## The Legality of the Police Conduct

The undisputed fact is that the police, without warrant to do so, spent three uninvited hours in petitioners' home and placed considerable restraints on Paul's freedom. The People's attempt to disinfect this conduct is not persuasive.

They first argue that the Fourth Amendment only forbids unreasonable searches and seizures. We agree. They then claim that once Officer Fisk was denied permission to search and had told Paul that he would get a warrant, it was reasonable for him and his fellow officers to believe that Paul would attempt to destroy any contraband on the premises, unless he was kept under observation. That, too, is obviously true. They then say that in view of that exigent circumstance, Fisk's "only recourse was to place petitioner Paul Shuey under surveillance." To prove that such "surveillance"[5] was legal they rely on *People* v. *Edgar,* 60 Cal.2d 171 [32 Cal.Rptr. 41, 383 P.2d 449].

The very facts of *Edgar* point up where the investigation in this case went awry.

Edgar, who was in jail awaiting trial, had been overheard by a deputy sheriff, when he told his mother to hide certain photographs which were in their home. When the mother got to the home two officers were already there. They asked her for the pictures. She produced them unwillingly, after being illegally threatened with arrest. The People argued, however, that the threat was immaterial, since there was a right to search for the pictures. They pointed to the necessity which presented itself, namely that the mother would dispose of the evidence if the police left to obtain a warrant. Answering this contention the Supreme Court said that the officers: ". . . could have kept his mother under surveillance, and forewarned of what Edgar wished her to do, they were confronted with no substantial risk that she would succeed in putting the pictures beyond their reach before a warrant could be obtained." (*People* v. *Edgar, supra,* 60 Cal.2d at pp. 175-176.)

In *Edgar* the impetus for the emergency created by the threatened loss of the pictures was Edgar's instruction to his mother. If the police had stopped to obtain a warrant before arriving at the residence, their quest would have been futile. In the case at bar the impetus for the anticipated disposal of the contraband was the fact that the police, after doing nothing for five days, chose to alert Paul when they had no search warrant, instead

---

[5]"Surveillance" is, of course, a rather euphemistic description of what actually took place.

of dropping by a magistrate's chambers on their way to his home. The record contains no evidence of even a hunch that Paul was more likely to dispose of whatever contraband he had at 11 a.m. on December 27, than he had been at any hour since December 22. The emergency was strictly of the "do-it-yourself" variety.[6]

We do not intimate what the correct answer should be where the police are faced with an emergency not of their own making. Certainly no court by whose decisions we are bound has ever answered the question and we need not attempt to do so in this proceeding.[7]

### Are Petitioners Estopped to Rely on the Exclusionary Rule?

For the purpose of our discussion here we assume that petitioners proved

---

[6]During argument in the respondent court the prosecutor attempted to justify the initial bypassing of the magistrate as follows: "Now, as a practical matter, in the community of this size, with the volume of crime that we have and that the officers handle. if they had to go and spend time getting a search warrant in every case. if that were the law, they just wouldn't be able to handle their case load and be able to handle maybe only 10 percent of what they actually handle. The Court well knows that they usually go out and conduct an investigation in the field and then if need be, then go back and obtain a search warrant. That is what they did in this particular case." These assertions are not based on evidence. We may grant, for the sake of argument, that a lot more searching can be accomplished if the police habitually attempt to go the consent route. How many of those so-called consent searches would stand up under judicial scrutiny is another question. In any case the attempted reliance on lack of manpower—if ever valid—is not too convincing. It will be noted that in the case at bar three officers were occupied for a total of nine man-hours, only three of which were devoted to obtaining the warrant. Most of the other six were spent watching Paul and his attorney play chess.

[7]The intimations from *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], are arguably to the effect that even in the situation with which we are not faced, the evidence would have to be suppressed. It will be recalled that in *Chimel* officers came to the defendant's home to arrest him. The arrest was legal. After the defendant had been arrested the entire house was searched. The majority held, of course, that the search exceeded the constitutionally permissible scope and ordered the evidence which was its fruit to be suppressed. Significant is Mr. Justice White's dissenting opinion. It was his view that the warrantless search was permissible because the legal arrest in the defendant's home provided "an exigent circumstance justifying police action before the evidence [could] be removed, . . ." (*Chimel* v. *California, supra,* 395 U.S. at p. 780 [23 L.Ed.2d at p. 704].) Mr. Justice White felt that it was "unreasonable to require the police to leave the scene in order to obtain a search warrant when they are already legally there to make a valid arrest, *and when there must almost always be a strong possibility that confederates of the arrested man will in the meanwhile remove the items for which the police have probable cause to search.*" (*Chimel* v. *California, supra,* 395 U.S. at p. 774 [23 L.Ed.2d at p. 700]. Italics added.) Admitting that it is not customary for a dissenting opinion to point to ways in which the asserted error of the majority view can be alleviated, it is nevertheless of some significance that Mr. Justice White assumed that if the police could not search incident to the arrest, they had no choice but to leave the premises, thereby permitting confederates of the arrestee to remove incriminating evidence.

that but for the illegal occupation of their apartment the search pursuant to the warrant would have been fruitless.[8]

In view of Justice Cole's dissent, it is advisable to consider the present problem in proper legal perspective, particularly from the point of view of an intermediate appellate court:

1. Whether or not the exclusionary rule, as such, is sound policy, is no business of this court.

2. ■ The purpose of the exclusionary rule, which was only recently restated by the Supreme Court in *Kaplan* v. *Superior Court,* 6 Cal.3d 150, 155-156 [98 Cal.Rptr. 649, 491 P.2d 1] is twofold: "[T]o deter law enforcement officers from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in such illegal conduct."[9]

3. ■ Ever since *People* v. *Martin,* 45 Cal.2d 755, 760-761 [290 P.2d 855], California has enforced the so-called "vicarious exclusionary rule," which, in brief, does not require a defendant who would suppress illegally obtained evidence to prove that he has "standing" to raise the issue. *Kaplan* v. *Superior Court, supra,* affirmed the continued vitality of the *Martin* rule. Its rationale was restated: " '[I]f law enforcement officers are allowed to evade the exclusionary rule by obtaining evidence in violation of the rights of third parties, its deterrent effect is to that extent nullified. Moreover, such a limitation virtually invites law enforcement officers to violate the rights of third parties and to trade the escape of a criminal whose rights are violated for the conviction of others by the use of the evidence illegally obtained against them.' " (*Kaplan* v. *Superior Court, supra,* at pp. 156-157, quoting *People* v. *Martin, supra,* 45 Cal.2d 755, 760.)

The reason why we stress the rationale of *Martin* and *Kaplan* is to point up that in California we enforce the exclusionary rule for its deterrent effect, disregarding nice questions of standing with respect to the particular defendant who moves to suppress. Our view is not so much that we come to the aid of particular persons who are victimized by illegal law enforcement, but that the victim of the illegality is the judicial process itself.

---

[8]As will be seen, while the record persuasively suggests that the petitioners carried their burden on the "but for" issue, we believe that a retrial thereon is in the interests of justice in this case.

[9]This dual purpose was adverted to by the United States Supreme Court in *Harrison* v. *United States,* 392 U.S. 219, 224, footnote 10 [20 L.Ed.2d 1047, 1052, footnote 10, 88 S.Ct. 2008]: ". . . But it is, not deterrence alone that warrants the exclusion of evidence illegally obtained—it is 'the imperative of judicial integrity.' "

We emphasize this view, because it is obvious that—legalities aside—Vickie's position is more appealing than Paul's: she need not, as he must, urge that she herself would have destroyed evidence. ■ This is important because ". . . In a jurisdiction, such as ours, where a defendant need not have standing to object to illegally obtained evidence (*People* v. *Martin*, 45 Cal.2d 755, 759-761 [290 P.2d 855]); a seizure is either legal or illegal, regardless of the person against whom the prosecution seeks to introduce the evidence. . . ." (*People* v. *Superior Court*, 274 Cal.App.2d 228, 231 [78 Cal.Rptr. 830].) The identity of the defendant is a neutral factor.

*Martin* and *Kaplan* therefore demand that "his" result in this court must be the same as "hers," and that we must not be swayed by disapproval of what Paul would have done, had his visitors departed at 11 a.m. The incidental beneficiaries of the exclusionary rule are rarely model citizens.

With these principles in mind, it is hard to see why petitioners should not be able to claim the benefit of the rule. Prolonged warrantless police occupations of residences and the detention of persons found therein, are a practice from which the police should be deterred; that factually the contraband found was the fruit of the illegality is assumed for the purpose of this discussion. What then, is there in this case which arguably "unpoisons" it?

Whether evidence factually the fruit of illegal police conduct should be suppressed is purely a question of policy to be determined by those courts which fashioned the exclusionary rule in the first place. No formula supplies an objective yardstick. When a court comes to the conclusion that in a particular case the fruits of illegal conduct should not be suppressed and says that the connection between illegality and seizure has become so "attenuated" that the taint has become "dissipated," it merely states a conclusion arrived at by following compelling precedent or its own judgment, guided by the objectives of the exclusionary rule itself.

We know of no compelling precedent. As far as the objectives of the exclusionary rule are concerned, we think they clearly demand suppression in this case. ■ To be sure, the police are to be encouraged to obtain warrants whenever possible, but the fact that they do so in a particular case does not retroactively purify preceding misconduct.[10]

---

[10]The police are also encouraged to make legal arrests and are permitted to search persons so arrested. Could it be contended, however, that if they confidently and correctly expect that three hours from a given moment they will receive information which will then justify a legal arrest and search pursuant thereto, they can "secure" the person of the suspect in the meanwhile? Would the police be able to say, in such

Justice Cole argues in the dissent that *Krauss* v. *Superior Court*, 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023] is a binding precedent which applies here. We respectfully differ.

The facts of *Krauss* are correctly stated by Justice Cole. The only possible effect of the illegality was that "but for" the illegal inspection of the motel room, the officer might never have bothered to submit the legally gathered evidence to the magistrate. However, nothing illegal was done to insure that the contraband would still be in the room at the time of the execution of the warrant. The only harmful effect of the holding in *Krauss* with relation to the deterrent purpose of the exclusionary rule was, as the dissent in the case points out, that it encouraged the police to ascertain illegally whether obtaining a search warrant would be worthwhile. This, the dissent admitted, made a practical difference only in situations where the illegal inspection persuades the police not to bother to get a warrant. Thus even in the view of the dissenters, the illegality did not lead to the seizure of the evidence which Krauss sought to suppress. There was no poisonous fruit. The dissenters simply objected to the relinquishment of an opportunity to discipline the police. Thus viewed, *Krauss* is by no means unique. In other contexts we regularly pass up opportunities to deter illegal law enforcement. (E.g., *People* v. *Valenti,* 49 Cal.2d 199, 203 [316 P.2d 633].)

### Is the Evidence Sought to Be Suppressed Factually the Fruit of the Illegality?

Since in the type of case which we are discussing the actual search and seizure is pursuant to a warrant, it is the burden of the party making the motion to suppress to prove that but for the invasion of the occupants' privacy, the search would have been fruitless. (Evid. Code, § 664; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23].)

■ We are satisfied that the issue whether the search warrant would have been returned *nulla bona,* had Paul been left alone after the 11 a.m. alert, was never fully tried in the respondent court. While on the record that was made, petitioners seem to have a pretty strong case,[11] the court

a case, that the fruits of the arrest should not be suppressed, because the case for suppression is based on the proposition that had the suspect been permitted to be on his way after the initial stop, he would have headed for the nearest bathroom?

[11]Obviously a party in Paul's position must assume a perverse position on the issue whether the illegal presence of the policemen at his home produced "fruits": the very factors which would support a conviction, if the evidence is not suppressed, indicate that, given a chance by being left alone, Paul would have known where the contraband was and—conscious of guilt—would have destroyed it. We point out that

never really ruled on it because it found nothing wrong with the seizure of the home. Whether the People could have offered additional evidence on the issue, we do not know.[12]

Under the circumstances we think it would be unfair to the People to grant the writ simply with directions to suppress. Rather we should direct the trial court to reconsider its ruling on the motion to suppress in the light of this opinion on the applicable law and any additional evidence on the issue of causation which the parties may care to present.

Writ granted with directions.

Stephens, J., concurred.

**COLE, J.,**[*] Dissenting.

The effect of the majority decision is to extend the exclusionary rule to a situation where neither the reason for the rule nor the facts of the case call for its application.

Some basic propositions should be kept in mind: As the majority recognizes, the purpose given for the rule requiring exclusion of illegally obtained evidence is that such a rule will act to deter unlawful police conduct. (*Mapp* v. *Ohio,* 367 U.S. 643, 651-653 [6 L.Ed.2d 1081, 1087-1089, 81 S.Ct. 1684]; *Lockridge* v. *Superior Court,* 3 Cal.3d 166, 171 [89 Cal.Rptr. 731, 474 P.2d 683].) Peace officers are to be encouraged to comply with the Fourth Amendment and to secure warrants rather than to proceed without the interposition of a detached and neutral magistrate. In this case the officers involved attempted to, and in fact did, secure a warrant whose validity is unchallenged here. They were trying to comply in a manner they thought to be constitutionally permissible. They were doing so in a factual context never before adjudicated. (*Barajas* v. *Superior Court,* 10 Cal.App.3d 185, 189-190 [88 Cal.Rptr. 730].) When the officers in this case acted as they did they had no reason to assume that their acts would subsequently be found to be improper.

---

the defendant may himself testify on that issue without fear that his testimony will later be used against him. (*Simmons* v. *United States,* 390 U.S. 377, 390-394 [19 L.Ed.2d 1247, 1256-1259, 88 S.Ct. 967].)

[12]The record does not even reveal just how, if at all, the contraband was hidden. We may perhaps safely assume that it was not in plain view, but all we really know is that it was found in the living room and in the kitchen. Theoretically it is possible that the People could offer evidence that it was so well hidden that it might be inferred that Shuey would not have disposed of it, hoping foolishly that the search would not uncover it. Other sophisticated possibilities readily come to mind.

[*]Assigned by the Chairman of the Judicial Council.

Conceding the impropriety of the officers' presence in petitioners' house while the search warrant was being secured—a concession made necessary because the risk that petitioners would refuse to consent to a search is inherent in asking for that consent and because no emergency or other circumstance justified an arrest at the time of entry—does not mean that the evidence recovered in the search which followed the procurement of the warrant should be suppressed.

It is my view that there simply is no causal relation as a matter of law. between the illegal entry and the legal search. I would hold that as a matter of law there is no "taint" to the evidence.

I am unable to distinguish the facts of this case from the principle enunciated in *Krauss* v. *Superior Court,* 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023]. In *Krauss* a motel employee, while lawfully performing her duties in cleaning Krauss' motel room, discovered what she believed to be marijuana. She advised her manager who inspected the items and a police officer was then called. He entered the room to see for himself and then left. This entry was held to be illegal. Paralleling the facts of this case, the officer in *Krauss* went to a magistrate, and without telling him of his own illegal entry, recited the facts of the motel personnel's discovery. A search warrant was issued and the officer reentered the room, seized the evidence and arrested Krauss, who by that time had returned to his room. The Supreme Court refused to suppress the evidence. It said: "Before that entry Sergeant Guevara had lawfully acquired information from the motel employees that was sufficient to support the issuance of a search warrant. It was unlawful for him to use that information to obtain the warrant. The magistrate's independent decision to issue the warrant was in no way tainted by the officer's illegal personal observations, for the magistrate was wholly unaware of such observations. Although those observations may have contributed to Officer Guevara's decision to secure the warrant, he did not thereby exploit them within the meaning of *Wong Sun* [371 U.S. 471 (9 L.Ed.2d 441, 83 S.Ct. 407)]. Thus in *Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 7 [88 Cal.Rptr. 380, 472 P.2d 468], we held that an occupant's subsequent consent to an entry motivated by an asserted prior illegal observation dispelled any taint flowing from that observation. Similarly the magistrate's independent evaluation of Officer Guevara's affidavit dispelled any taint flowing from his original entry. To hold otherwise would go beyond excluding evidence unlawfully obtained and in effect grant petitioner immunity from prosecution because of the officer's collateral wrong." (*Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 422-423.)

It is suggested that the distinction between *Krauss* and the case at bench is that in the former there was no danger that the contraband would be destroyed because Krauss did not know it had been discovered, while here petitioner Paul Shuey, at the least, was in a position where, if the officers left, he would be able to destroy the contraband and thwart the later search. That is a likely possibility. It is not a fact of such ponderable legal significance as to warrant suppression of the evidence.

A simple illustration establishes this: if the officers who were detaining Shuey tired of their task and departed before the other officer returned with the warrant and successfully executed it, it could not be argued that the detention played a role in the seizure of the contraband. The detention would have been just as illegal as the one which actually occurred. But the validity of the search, pursuant to a valid warrant, would not be tainted or in any way affected by the detention. This would be so whether the contraband was not destroyed because petitioners lacked the time to do so, because they thought it to be securely hidden or so valuable that they preferred to run the risk of discovery, or because of some other reason.[1]

No purpose of the exclusionary rule is served in these circumstances. In sending for a warrant the officers involved in this case were already trying to comply with constitutional commands, not to thwart them.

In his dissent in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 411 [29 L.Ed.2d 619, 635, 91 S.Ct. 1999], Chief Justice Burger points out that the suppression doctrine should not be enforced inflexibly, rigidly, and mechanically, that inadvertent errors of judgment which do not work any grave injustice should not be treated in the same way as deliberate flagrant violations of the Fourth Amendment, and that society has a "right to expect rationally graded responses" in the application of the exclusionary rule. (403 U.S. 388, at pp. 418-420 [29 L.Ed.2d 619, at pp. 639-641].)

This would appear to me to be particularly true where, as here, "the magistrate's independent evaluation of [the search warrant] affidavit dispelled any taint flowing from [the] original entry." (*Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 423.)

If it is suggested that admission of the evidence in this case will lead to future illegal peace officer conduct in securing other premises while a warrant is being secured, it seems to me the answer is two-fold:

---

[1]It is stultifying to suggest that a causal link between illegal detention and seizure under the warrant exists because petitioner Paul Shuey was deprived of the opportunity to destroy the marijuana and amphetamines.

First, while the ineffectiveness of the exclusionary rule as a tool to prevent Fourth Amendment violations has been the subject of much comment (see e.g., Burger, C. J., dissenting, *Bivens* v. *Six Unknown Fed. Narcotics Agents, supra,* 403 U.S. 388, 411 [29 L.Ed.2d 619, 635]; *People* v. *Cahan,* 44 Cal.2d 434, 444-445 [282 P.2d 905, 50 A.L.R.2d 513]; (majority opn. of Traynor, J.)), it should not be assumed that, being advised that certain conduct is impermissible, peace officers will continue nonetheless to ignore the commands of the Fourth Amendment. Given a clear understanding of just what the law is I assume, rather, that peace officers will abide by it because they recognize the dictates of the law.

Thus, in this case, the officers—who obviously had enough time to do so—might well have chosen to procure the warrant first rather than trying to obtain Shuey's consent to a search had they known they could not lawfully secure his house when consent was refused.

Second, if the problem must be approached in terms of deterrence of improper conduct, Congress has created a federal cause of action against state officials who act improperly under color of state law (42 U.S.C. § 1983), and the Legislature could easily create its own remedy.

I would deny the writ.[2]

A petition for a rehearing was denied March 2, 1973. Cole, J.,* was of the opinion that the petition should be granted. The petition of the real party in interest for a hearing by the Supreme Court was denied April 12, 1973. McComb, J., Burke, J., and Clark, J., were of the opinion that the petition should be granted.

---

[2]Of course I completely agree that if a writ has to be granted the trial court should be free, as the majority indicates, to determine whether there was any connection between the officers' unlawful presence in petitioners' home and the later search.

*Assigned by the Chairman of the Judicial Council.