[Civ. No. 33474, First Dist., Div. Four. Jan. 9, 1974.]

HILBERTO FERDIN, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Mintz, Giller, Himmelman & Mintz and James Giller for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Robert R. Granucci and Martin S. Kaye, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**DEVINE, Acting P. J.**\*—Petitioner, Hilberto Ferdin, was charged by information with violation of Health and Safety Code section 11500.5 (possession of heroin for sale). Pursuant to Penal Code section 1538.5, he moved to suppress certain evidence in the Alameda County Superior Court. The court denied the motion, and petitioner now seeks a writ of mandate to compel suppression of the evidence seized.

On October 7, 1971, an untested informant told Detective Guzman of the Union City Police Department that one Hector Garcia, an alien illegally in this country, was transporting large amounts of heroin for the petitioner and Joseph Ferdin. Information from official police channels revealed that Joseph Ferdin was arrested in Mexico around March 1970, but that he had subsequently fled from that country and was then a fugitive. Other Alameda County officers had also advised Detective Guzman that Joseph Ferdin was a suspect in various narcotics investigations in Alameda County. At approximately 11 a.m. on October 12, 1971, Detective Guzman once again spoke with the informant. At this time he was informed that Garcia was going to receive some heroin from the petitioner, and then, sometime that evening, deliver it to Olivia Miramontes who lived on Industrial Boulevard in Hayward.

Commencing at about 3 p.m., Garcia was placed under surveillance. At 5:30 p.m., several officers under the direction and control of Detective Guzman and an agent of the Bureau of Narcotics Enforcement, observed Hector Garcia drive to a residence located at 33749 Third Street. There, Detective Guzman saw petitioner and Garcia conversing with one another

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

as they sat on the porch of the house. Petitioner went into the house for a brief time, but soon returned, carrying a small package in his hands. Both men walked to Garcia's car and, while there, an exchange of the package occurred. After receiving the package and entering his car, Garcia bent over from the driver's side of the car to the right front seat and was momentarily out of sight. He then returned to the house, carrying nothing in his hands.

Garcia went home before embarking on another trip, but he carried nothing into the house. When he left home, he first purchased some gasoline and then continued driving on Industrial Parkway in Hayward.[1] Here, between 8 and 8:30 p.m., Garcia's car was stopped for detention and investigation. Among the officers present when Garcia was being detained was an investigator for the United States Immigration and Naturalization Service. Questioning revealed that Garcia was indeed in the United States illegally. He was placed under arrest. The car was searched and five prophylactics containing what appeared to be heroin were found under the right front seat. Garcia was then transported to the Hayward police station where, after having been advised of his *Miranda* rights, he admitted that he was a runner for petitioner and Joseph Ferdin, and that the heroin found in his car that evening was the package he picked up earlier that day. He also stated that he was paid $5 for every ounce of heroin he delivered, and that within the past six months he had seen petitioner bring approximately 50 ounces of heroin to 33749 Third Street.

Upon completion of Garcia's interrogation, Officer Gilbert ordered the house at 33749 Third Street secured so as to prevent the destruction of incriminating evidence during the period in which a search warrant was being obtained. Sometime between 10 and 10:20 p.m., Officer Gilbert and several other officers arrived at the residence. Gilbert knocked on the front door five or six times and identified himself, saying two or three times, "Police, State Narcotics." None of the officers was in uniform, and some of the officers had their guns drawn. After approximately four minutes, the door was partly opened and Officer Gilbert once again identified himself. The door was then shut. Thereupon, the officers forcibly reopened the door and entered the residence. At this same moment, Officer Kane and at least three other officers entered the house by breaking through a back door in the garage. Inside, the officers found petitioner and petitioner's mother and father. As a result of this entry, Mrs. Ferdin became hysterical. Petitioner was given a pat search and thereafter the three occupants were, in effect, held in custody. For the next two hours, while the search warrant was

---

[1]Industrial Parkway is an extension of Industrial Boulevard.

being prepared, seven officers remained on the premises. During this time, the three occupants were kept under close observation and were accompanied to whichever room they went. (A police matron attended Mrs. Ferdin.) They were not permitted to answer their phone. However, apart from a cursory examination of the rooms of the house in order to determine whether there were additional occupants, no search was conducted.

At 12:15 a.m., Officer Gilbert returned to the residence with a search warrant. Petitioner led the officers at once to a clothes bag containing heroin in the closet of a rear bedroom. Petitioner was then placed under arrest. His parents, however, were neither arrested nor charged with any offense.

### The Arrest of Garcia

Part of petitioner's argument rests upon invocation of the vicarious exclusionary rule, expounded in *Kaplan* v. *Superior Court,* 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1] and *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855], as related to two instances in the course of events which led to the finding of the contraband within the home. The first instance is that of the arrest of Garcia. Petitioner contends that the arrest of Garcia as an illegal alien was used only as a pretext to search him or his vehicle for contraband. He argues that if an illegal alien's arrest had been desired, it could have been accomplished during any of the period of surveillance between October 7 and October 12, 1971. Although the motion for suppression of evidence does not relate to the heroin found in Garcia's automobile, but to that found in the Ferdin home, it is argued by petitioner that any information which the officers obtained from Garcia was fruit of the poisonous tree, wherefore the evidence obtained from the use of that information is inadmissible.

Evidence which is obtained by arrest which is a subterfuge must be suppressed. (*Cunha* v. *Superior Court,* 2 Cal.3d 352, 358 [85 Cal.Rptr. 160, 466 P.2d 704]; *People* v. *Fein,* 4 Cal.3d 747, 755 [94 Cal.Rptr. 607, 484 P.2d 583].) But this proposition is unavailing in the present case. In the first place, the "pretext" argument was made in the superior court and was rejected by the judge. The rejection was reasonable. Immigration officers are charged with the duty of arresting aliens who are in this country illegally. Because of the magnitude of their task, it is legitimate and reasonable for them to concentrate their efforts on those persons who are suspected of criminal activities. The immigration inspector did not make the arrest until he had ascertained, by interrogation, that Garcia was indeed illegally in the United States.[2] Petitioner does not make any point in his

---

[2]Subsequently, a warrant for deportation of Garcia was issued.

argument on the subject of the right of the immigration officer to stop Garcia and to question him, but limits his contention to that of the "pretext." In the second place, the action of the immigration officer may be regarded as surplusage. The narcotics officers had probable cause to search the vehicle, whether or not an arrest was made, because there was probable cause to believe that it contained contraband and it was not practicable to secure a warrant. (*People* v. *Barrett,* 2 Cal.App.3d 142, 146-148 [82 Cal.Rptr. 424].) ■ Probable cause was established by the untested informant's information, which had been corroborated by the support which had been given to his statements about Joseph Ferdin, and also by the correctness of his prediction that Garcia would receive heroin (he did receive a package) from petitioner on the evening of October 12, 1971; then by the fact that the package which was handed to him was placed by Garcia below or to the side of the right front seat of the vehicle, a place where it would not be seen readily; then by the fact that Garcia drove, after he had received the package, on Industrial Parkway toward Hayward, where the informant had said the heroin would be delivered to a named recipient, Olivia Miramontes.

Thus, the information obtained from Garcia following his arrest was not fruit of the poisonous tree, but was legitimate information, and it would give rise to an inference that additional contraband was present in the home of petitioner. (*People* v. *Superior Court (Marcil),* 27 Cal.App.3d 404, 411 [103 Cal.Rptr. 874].) The officers used the information gained from Garcia in the affidavit for the search warrant.

## Knock and Notice

■ Although the facts were disputed in the superior court, we accept those impliedly found by the trial judge, which were: That Officer Gilbert knocked on the front door five or six times and identified himself, saying two or three times, "Police, State Narcotics." After the passage of about four minutes, someone opened the door and then closed it immediately when Officer Gilbert again identified himself. The police then forcibly entered the house

It was reasonable for the officer to conclude that one or more occupants would attempt to dispose of evidence, and therefore full compliance with the knock and notice requirements was excused. (*People* v. *Boone,* 2 Cal. App.3d 503, 505-506 [82 Cal.Rptr. 566].) When the officers returned with the search warrant it was unnecessary for them to knock and give notice, because the house had been secured and there was no danger of violent confrontation.

## Securing the House

■ Petitioner's main point is that the officers did not have the right to "secure" the Ferdin home by occupying it until a search warrant could be obtained. It is important to note that although the evidence here again was in conflict, the court found in favor of the testimony of the officers, that no search was conducted until the warrant arrived. In fact, they saw no contraband until that time. What they did was to prevent destruction of evidence by accompanying the occupants during the time when the warrant was being obtained.

Petitioner relies on *Shuey* v. *Superior Court,* 30 Cal.App.3d 535 [106 Cal.Rptr. 452], as authority for invalidating the securing of the home. The *Shuey* case is readily distinguishable. In *Shuey,* the People expressly disavowed any claim that there was a right to arrest Shuey before the contraband was actually found. Moreover, there was no semblance of exigent circumstances. The premises had been suspect for several days as containing marijuana. The officers requested consent to search, and when this was refused they entered, announcing that they would secure the premises until a warrant would be obtained. Later, the warrant was issued. In the case before us, the officers had probable cause to arrest Ferdin. The information obtained from the informant had by this time been confirmed by the discovery of the heroin in the vehicle and by the confession of Garcia. The fact that the officers did not actually announce to Ferdin that they were arresting him and that they did not at once bring him to the police station to be booked, but rather detained him and the other occupants, did not weaken the authority with which they were vested.

It is argued that the officers should have obtained the search warrant before approaching the house. But, unlike the situation in *Shuey,* there was evidence of an ongoing operation in narcotics traffic. As time passed (and it took about two hours to obtain the search warrant), the officers might reasonably believe that Ferdin would become uneasy and either destroy the contraband or be on the alert to dispose of it if anyone should approach the house or secrete it more effectively. What arrangements had been made between Ferdin, Garcia and Miramontes, the police could not know. But if Garcia or Miramontes was to have reported upon the completion of the delivery, or if Miramontes were to telephone to Ferdin inquiring why the delivery had not been made, or if someone else known to Garcia had suspected his arrest or other difficulty from his disappearance and had communicated with Ferdin, the contraband probably would have been destroyed or made ready for immediate destruction.

Of course, mere probable cause for officers to believe that contraband is within a home will not justify a warrantless search. (*Agnello* v. *United States,* 269 U.S. 20, 23 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409]; *People* v. *McGrew,* 1 Cal.3d 404, 409 [82 Cal.Rptr. 473, 462 P.2d 1]; *People* v. *Marshall,* 69 Cal.2d 51, 57 [69 Cal.Rptr. 585, 442 P.2d 665].) But the combination of circumstances present here: the probable cause to arrest Ferdin and the danger that the miscarriage of the Garcia mission would become known to Ferdin with consequent destruction of contraband, justify the actions, less than search, of entry and monitoring the occupants. (See *Barajas* v. *Superior Court,* 10 Cal.App.3d 185 [88 Cal.Rptr. 730].)

Although the parents of Ferdin were understandably distressed, the police procedure cannot be characterized as oppressive to the degree that evidence should be suppressed (if, indeed, overbearing conduct, particularly towards others than the accused, which did not *produce,* but at most *secured* evidence, could activate the exclusionary rule).

The petition for writ of probation and/or mandate is denied, and the alternative writ is discharged.

Rattigan, J., and Christian, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied March 8, 1974. Mosk, J., was of the opinion that the application should be granted.