[No. H004916. Sixth Dist. May 25, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE M. CAMILLERI, Defendant and Appellant.

COUNSEL

Rose & Arnold, Ronald W. Rose and Cindy A. Diamond for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John S. Sugiyama, Assistant Attorney General, Stan M. Helfman and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AGLIANO, P. J.—

1. *Introduction*

Defendant Bruce Camilleri questions whether under the circumstances of this case the Fourth Amendment permitted police to enter and "secure" his residence pending procurement of a search warrant. Defendant pled guilty to possession for sale (Health & Saf. Code, § 11351) and sale (Health & Saf. Code, § 11352) of 57 grams or more of a substance containing cocaine (Pen. Code, § 1203.073, subd. (b)(1)). Defendant appeals from the judgment and seeks review of the denial of his second motion to suppress evidence. (Pen. Code, § 1538.5, subd. (m).) For the reasons stated below, we will affirm.

2. *Procedure*

Defendant's first suppression motion in superior court claiming lack of consent and failure to comply with the knock-notice provisions of Penal Code section 844 was denied after a hearing on April 6, 1988. On June 6, 1988, with new counsel, defendant filed a second pretrial motion claiming illegal warrantless entry. Original defense counsel declared that he had

failed to make the current argument through "neglect on my part, and not due to any tactical decision." On July 15, 1988, the court, over objection, reached the merits "rather than subjecting the judicial process to subsequent appeals, writs of habeas corpus and other remedies." The motion was denied.

■ Where a pretrial suppression motion has been fully litigated, the superior court lacks jurisdiction to entertain a second pretrial suppression motion. Penal Code section 1538.5, subdivision (h), only permits a second suppression motion at trial on the limited bases of lack of earlier opportunity or newly discovered grounds. (*People v. Nelson* (1981) 126 Cal.App.3d 978, 981-982 [179 Cal.Rptr. 195], and cases there cited; *People v. Thomas* (1983) 141 Cal.App.3d 496, 501 [190 Cal.Rptr. 408].) However, "if the ineffectiveness of counsel infected the first suppression hearing, the defendant cannot be said to have had opportunity for 'full determination'" of the grounds to suppress evidence. (*People v. Superior Court (Corona)* (1981) 30 Cal.3d 193, 200 [178 Cal.Rptr. 334, 636 P.2d 23].)

■ Regardless of the superior court's jurisdiction to entertain a second pretrial suppression motion, defendant is entitled to assert on appeal that he was denied effective assistance of counsel on the first suppression motion. (Cf. *People v. Ledesma* (1987) 43 Cal.3d 171, 226-227 [233 Cal.Rptr. 404, 729 P.2d 839].) A claim of ineffective assistance should be made by petition for habeas corpus instead of appeal when "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged." (*People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) If, however, "there simply could be no satisfactory explanation" (*ibid.*), an appeal is appropriate. We view defendant's appeal in this light. Our concern is whether defendant has established a case of ineffective assistance. ■ "To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable." (*People v. Babbitt* (1988) 45 Cal.3d 660, 707 [248 Cal.Rptr. 69, 755 P.2d 253].)

3. *The facts underlying the suppression motion*

■ We are bound to resolve factual conflicts and draw inferences in favor of the trial court's order. (*People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223-1224 [266 Cal.Rptr. 473].) So viewed, the facts are as follows.

In June 1986, one Roland Marshall made a series of cocaine sales to an undercover officer working with an Allied Agencies Narcotics Enforcement

Team (AANET). The first sale, of 3.34 grams for $250, took place on June 12 in Marshall's car near a San Jose motel. The second sale, of 27.88 grams for $1,500, took place on June 17 in Marshall's mobile home. The cocaine was not there when the officer first arrived on that day, but it was when he returned. On display in the trailer was a gold-plated rifle.

The AANET plan was to discover Marshall's source of cocaine. During the first sale, the undercover officer discussed the purchase of larger quantities, such as a kilogram. As a result, the sale of a kilogram for $36,000 was arranged for June 23. The undercover officer and Marshall met at 6:10 p.m. in the parking lot of a convenience store in Los Gatos. The officer displayed the money and Marshall displayed what he said was a quarter pound of cocaine in a ziplock plastic baggie. Marshall said he would have to drive to his "man's" house and would return in 15 minutes with the kilogram. He left the parking lot at 6:20 p.m.

AANET officers followed Marshall's car to a nearby house. He parked by a side porch, where he entered the house empty-handed. Marshall and defendant emerged from the house and talked on the porch. Marshall was carrying a paper bag or box, which he placed in the passenger side when he returned to his car.

One AANET officer maintained surveillance of the house while others followed Marshall back to the convenience store parking lot where he arrived at 6:38 p.m. He was arrested after he showed the undercover officer a kilogram (actually 1,006 grams) of cocaine. A handgun was found in a sports coat on the backseat of Marshall's car.

After the arrest, AANET officers conferred briefly in the parking lot and decided to secure the cocaine source's house while seeking a search warrant. An officer testified that in his experience obtaining a telephonic search warrant would take two hours and "the source of supply would be expecting the payment for the kilo very soon after it had left the residence, and when that money did not arrive the source of supply would know something was wrong." He assumed a drug dealer would get nervous about an unexplained delay in payment and might either flee or destroy evidence.

At 7 pm., AANET officers surrounded the house. There had been no unusual activity after Marshall left. One or two vehicles had arrived. No one had departed. A team of at least five officers approached the porch entrance. The screen door was closed but the door behind it was open. One officer knocked, identified his group as police officers, and demanded entry to secure the house. Two occupants, visible from the door, made eye contact

with the officers but did not otherwise respond. The officers entered after 10 seconds.

The officers located four persons in the house, including defendant, handcuffed them and brought them into the living room. Officers checked chair and sofa cushions in the room for weapons prior to seating the occupants. A baggie containing 90 grams of cocaine, apparently the quarter pound displayed by Marshall, was located under one chair cushion.

At 7:20 p.m., defendant gave written consent to search his house after being advised the officers would otherwise attempt to obtain a search warrant. The search produced other packages of cocaine, the gold-plated rifle, and over $12,000 in cash.

4. *Was the warrantless entry justified?*

Defendant contends the first cocaine package found in the house, his consent to search, and other evidence were products of an unconstitutional entry and seizure made without warrant or other justification.

■ Undoubtedly it was both seizure and search in Fourth Amendment terms for government agents to enter the residence without consent, locate its occupants, detain them, and examine furniture for concealed weapons, even for the limited purpose of securing the residence pending arrival of a search warrant. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 850 [120 Cal.Rptr. 83, 533 P.2d 211]; *U.S.* v. *Howard* (9th Cir. 1987) 828 F.2d 552, 554; *U.S.* v. *Lindsey* (9th Cir. 1989) 877 F.2d 777, 780; cf. *Arizona* v. *Hicks* (1987) 480 U.S. 321, 324-325 [94 L.Ed.2d 347, 353-354, 107 S.Ct. 1149]; but cf. *People* v. *Larry A.* (1984) 154 Cal.App.3d 929, 935-936 [201 Cal.Rptr. 696].)

A. *The emergency exception to the Fourth Amendment in general*

In *People* v. *Poole* (1986) 182 Cal.App.3d 1004, 1011 [227 Cal.Rptr. 594], we quoted the following passage from *Payton* v. *New York* (1980) 445 U.S. 573, 589-590 [63 L.Ed.2d 639, 652-653, 100 S.Ct. 1371]. ■ " 'The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." [Citation.] In terms that apply equally to seizures of property and to sei-

zures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'"

■ *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], explains: " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. . . . [I]n each case the claim of an extraordinary situation must be measured by the facts known to the officers."

■ In *People* v. *Brown* (1989) 210 Cal.App.3d 849, 855 [260 Cal.Rptr. 293], we stated: "It is the prosecution's burden to prove exigent circumstances which would justify a warrantless search." (*People* v. *Williams* (1988) 45 Cal.3d 1268 [248 Cal.Rptr. 834, 756 P.2d 221], 1300, cert. den. 488 U.S. 1050 [102 L.Ed.2d 1006, 109 S.Ct. 883]; cf. *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 749-750 [80 L.Ed.2d 732, 104 S.Ct. 2091].) Implicit in this burden is a showing there was insufficient time to obtain a warrant. (*People* v. *Koch* (1989) 209 Cal.App.3d 770, 782 [257 Cal.Rptr. 483]; *U.S.* v. *Howard, supra,* 828 F.2d 552, 555; *U.S.* v. *Lindsey, supra,* 877 F.2d 777, 780-782.)

### B. *Supreme Court authority*

Police entry of a residence in order to prevent destruction of evidence pending procurement of a warrant has been approved by intermediate federal and state appellate courts, though not the highest courts.

At first glance, *Segura* v. *United States* (1984) 468 U.S. 796 [82 L.Ed. 2d 599, 104 S.Ct. 3380], would suggest the Supreme Court has agreed. (See *People* v. *Gesner* (1988) 202 Cal.App.3d 581, 588-589 [248 Cal.Rptr. 324].) Part IV of *Segura* analyzes at some length whether it was an unreasonable seizure for government agents to secure a dwelling from within while awaiting a search warrant. (*Segura, supra,* 468 U.S. at pp. 805-814 [82 L.Ed.2d at pp. 608-615].) That section concluded: "We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however that, absent exigent circumstances, a warrantless search—such as that invalidated in *Vale* v. *Louisiana* [1970] 399 U.S. 30, 33-34 . . .—is illegal." (*Id.* at p. 810 [82 L.Ed.2d at p. 612].) However, only two justices agreed on the reasoning in this part. (468 U.S. at p. 797, fn. [82 L.Ed.2d at p. 604]; see 2 LaFave, Search and Seizure (2d ed. 1987) § 6.5(c), p. 674.) Reasoning that does not command the assent of a majority of the United States Supreme Court is not a holding. (Cf. *Marks* v. *United States*

(1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 266, 97 S.Ct. 990].) What the majority agreed on in *Segura* was that evidence need not be suppressed when it derived from an independent, untainted source, namely a search warrant that was not based on information gained from the initial seizure.[1] (468 U.S. at pp. 813-816 [82 L.Ed.2d at pp. 614-616].)

The only California Supreme Court opinion to consider "the issue of the ability of the police to 'secure' premises prior to obtaining a search warrant" is *People* v. *Shuey, supra,* 13 Cal.3d 835, 848. There police occupation of the premises was found invalid because there was neither probable cause to arrest the occupant (*ibid.*) nor a true emergency. " 'The emergency was strictly of the "do-it-yourself" variety.' " (*Id.* at p. 849; quoting with approval prior appellate decision in *Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535, 541 [106 Cal.Rptr. 452].) The police secured the residence after its occupant refused to consent to their entry based on five-day-old information that he possessed marijuana. (13 Cal.3d at pp. 838-839.)

## C. *Other authority*

*People* v. *Shuey* distinguished two cases relied on by the People here as involving both probable cause to arrest and exigent circumstances. (13 Cal.3d 835, 849, fn. 7.) In *Ferdin* v. *Superior Court* (1974) 36 Cal.App.3d 774 [112 Cal.Rptr. 66], the police secured the residence of a suspected heroin dealer and its three occupants while obtaining a search warrant under the following circumstances. One occupant had been identified as a heroin dealer by other police officers and informants. A runner was arrested away from the premises in possession of heroin after obtaining a package produced by the occupant from the residence. The runner stated he obtained the heroin from the occupant, he delivered it for the occupant, and he had seen heroin in the residence. The occupants shut the door when the police knocked and identified themselves and demanded entry. (*Id.* at pp. 777-778.) The court recognized the circumstances as exigent in that "there was evidence of an ongoing operation in narcotics traffic" and "the officers might reasonably believe" the dealer "would become uneasy and either destroy the contraband or be on the alert to dispose of it if anyone should approach the house or secrete it more effectively" as time passed without the runner's return. (*Id.* at p. 781.)

---

[1] In part I of the opinion, a majority thus described one of the following holdings: "[W]here officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures. [Fn. omitted.]" (*Segura, supra,* 468 U.S. at p. 798 [82 L.Ed.2d at p. 604].)

In *People* v. *Freeny* (1974) 37 Cal.App.3d 20 [112 Cal.Rptr. 33], police secured the residence of a suspected heroin dealer while obtaining a search warrant under the following circumstances. The dealer sold some heroin to an associate who delivered it to an undercover officer. A second drug purchase was arranged with the dealer and his wife. The dealer was arrested in his car in possession of heroin after he left his residence. The police knocked on the door of the dealer's residence, aware his wife was inside. The officers heard footsteps running from the door and believed she was attempting to destroy contraband. (*Id.* at pp. 24-26.) The court recognized the circumstances as exigent in that "No reasonable man could conclude other than that Mrs. Freeny would destroy evidence of her guilt, which was equal to that of [her husband], if she learned of his arrest, nor would it be reasonable to assume she would not learn of the fact of his apprehension while the judicial process ground out the eventual search warrant." (*Id.* at pp. 32-33.) Also, the officers heard what sounded like an attempt to destroy evidence after giving notice of their presence. (*Id.* at p. 33.) The court stated there is no "constitutional right to destroy evidence." (*Ibid.*)

*Ferdin, supra,* 36 Cal.App.3d 774, recognized, "Of course, mere probable cause for officers to believe that contraband is within a home will not justify a warrantless search. (*Agnello* v. *United States* [1925] 269 U.S. 20, 23 . . . .)" (*Id.* at p. 782.) Nevertheless, both *Ferdin, supra,* at pages 781-782, and *Freeny, supra,* 37 Cal.App.3d 20, 33-34, also justified the warrantless entries of residences by the existence of probable cause to arrest. At the time it was an open question whether a warrant was needed to effectuate an arrest in a residence when there was probable cause. *Ramey, supra,* 16 Cal.3d 263, 270-276, soon answered that question affirmatively, without, however, overruling *Ferdin* or *Freeny*. "On the contrary, the doctrine of securing premises pending issuance of a search warrant is based upon the same emergency concept fully recognized in *Ramey* as an exception to the rule therein enunciated." (*People* v. *Rodriguez* (1981) 123 Cal.App.3d 269, 272 [176 Cal.Rptr. 798].)

A respected commentator has observed, "It is difficult to assess the *Ferdin* holding in terms of established Fourth Amendment doctrine, for convincing analogies are hard to come by." (2 LaFave, *op. cit. supra,* § 6.5(c), p. 679.) We find some guidance in California state cases after *Ferdin, Freeny,* and *Ramey* regarding the type of showing needed to justify the warrantless seizure and limited search involved in securing a residence suspected of containing drugs while a warrant is sought.[2] Both *People* v. *Daughhetee*

---

[2]Two cases relied on by defendant are not helpful. In *People* v. *Ellers* (1980) 108 Cal.App.3d 943, 950 [166 Cal.Rptr. 888], the only exigency asserted by the People was the possibility that an unknown amount of heroin in an apartment would be depleted by drug sales before a warrant could be obtained. There was no suggestion that the occupants would

(1985) 165 Cal.App.3d 574, 579 [211 Cal.Rptr. 633], relied on by the People, and *Koch, supra,* 209 Cal.App.3d 770, relied on by defendant, cite *United States* v. *Rubin* (3d Cir. 1973) 474 F.2d 262 (cert. den. 414 U.S. 833 [38 L.Ed.2d 68, 94 P.2d 173]) as containing the applicable law. *Koch, supra,* at page 782, explains: "The *Rubin* court, in what LaFave has called the 'most careful treatment of this point' (2 LaFave, *op. cit. supra,* at p. 658), formulated this test for determining whether the possible destruction of evidence justified a warrant [*sic*] entry. 'When Government agents . . . have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances, or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts included (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic."' (*Rubin,* 474 F.2d at pp. 268-269, citations omitted.)"

To justify the warrantless securing of a residence, the Ninth Circuit Court of Appeals similarly requires the prosecution to establish both the existence of probable cause to believe "that contraband or evidence of a crime would be found inside" and exigent circumstances. (*U.S.* v. *Lindsey, supra,* 877 F.2d 777, 780.) " '[M]ere fear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home.' (*United States* v. *Perez* (8th Cir. 1983) 700 F.2d 1232, 1237.) Instead, '[t]here must exist "specific and articulable facts which, taken together with rational inferences . . . ," support the warrantless intrusion.' (*United States* v. *Licata* (9th Cir. 1985) 761 F.2d 537, 543.)" (*Koch, supra,* 209 Cal.App.3d 770, 782.) Where the emergency is the imminent destruction of evidence, the government agents must have an objectively reasonable basis for believing there is someone inside the residence who has reason to destroy evidence. The reason may be the arrest of a confederate or another indication that the police are on their trail. (*U.S.* v. *Socey* (D.C. Cir. 1988) 846 F.2d 1439, 1445 [269 App.D.C. 453], (cert. den. 488 U.S. 858 [102 L.Ed.2d 123, 109 S.Ct. 152]) and cases there cited.) The police entry must

---

otherwise dispose of or destroy evidence. In *Rodriguez, supra,* 123 Cal.App.3d 269, "the officers did not claim that their decision to force a confrontation at the subject apartment was based upon any emergency concept." (*Id.* at p. 272.)

be " 'limited in scope to the minimum intrusion necessary to prevent the destruction of evidence.' " (*Ibid.*)

D. *The law applied*

In the instant case, the police had more information about the residence and its occupant than they did in *Koch*, relied on by defendant, but less than they did in *Ferdin, Freeny,* and *Lindsey,* relied on by the People. In *Koch, supra,* 209 Cal.App.3d 770, the police illegally secured a house 11 hours after its occupant was arrested with heroin in his truck. The police, however, had "no reason to believe that anyone was in defendant's house who could have destroyed any evidence or contraband. Instead, all the evidence suggested that no one was home." (*Id.* at p. 783; cf. *Vale* v. *Louisiana* (1970) 399 U.S. 30, 34-35 [26 L.Ed.2d 409, 413-414, 90 S.Ct. 1969].)

In *U.S* v. *Lindsey, supra,* 877 F.2d 777, the police knew a drug courier had picked up methamphetamine from a nearby house and the courier had informed an undercover officer that he had obtained the drugs from " 'a bunch of crazy bikers with guns and bombs.' " (*Id.* at p. 779.) The emergency, therefore, involved not only the presence of drugs in the residence, but dangerous explosives "in a densely populated residential neighborhood." (*Id.* at p. 781.) The court also stated: "This court has repeatedly recognized that the apprehension of a drug courier can itself create an exigency if the drug supplier is likely to become suspicious when the courier fails to return." (*Ibid.*) Based on one officer's substantial experience in methamphetamine transactions, he believed the supplier had "fronted" the courier the drugs and was awaiting his return with the money. (*Ibid.*)

In *Ferdin,* described above, the police not only knew the occupant had produced a package of heroin from his residence earlier that day and a runner had been arrested, but also heroin had been present in the residence before, according to the runner, and the occupant was a drug dealer, according to the runner and other police sources, and the occupants refused to consent to police entry. In *Freeny,* described above, the police knew the suspected dealer occupant was twice in possession of heroin and was once involved in its sale, his wife was also involved in arranging a sale, the dealer was arrested and would not be returning home, the wife was present in the residence, and instead of consenting to police entry she ran from the door.

In the instant case, the police were aware Marshall had obtained a large quantity of cocaine from his "man" in the house. Marshall had been arrested and would not be returning to the house with the $36,000 purchase price. An officer testified based on his experience that the drug source would be

expecting prompt payment for a kilogram of cocaine, and obtaining a telephonic search warrant could take two hours. Time was of the essence since the point of delivery was only 15 minutes from the house.

Based on this information, the police assumed there was evidence of crime in the house, the dealer was located there, would shortly become alarmed and would likely conceal or destroy contraband and other evidence of his guilt.

Defendant essentially questions the reasonableness of these assumptions. We agree with the trial court that they were reasonable and, under the particular facts presented, established the presence of exigent circumstances justifying the entry and seizure without a warrant.

Given the lack of merit of this theory for suppressing evidence, it is not reasonably probable that the outcome would have been altered had the theory been asserted in the first suppression motion. Defense counsel's admitted neglect did not prejudice defendant.

5. *Disposition*

The judgment is affirmed.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied June 14, 1990, and appellant's petition for review by the Supreme Court was denied August 15, 1990.